IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GP INDUSTRIES, LLC,<br>a Nebraska Limited Liability Company, | ) ) ) | CASE NO. 8:06CV50 |
| Plaintiff and Counter Defendant, | ) ) | |
| vs. | ) ) | |
| JAMES E. BACHMAN, | ) ) | |
| Defendant, | ) ) | MEMORANDUM AND ORDER<br>RE: CLAIM CONSTRUCTION |
| ERAN INDUSTRIES, INC.,<br>a Nebraska Corporation, | ) ) ) | |
| Defendant, Counter Claimant<br>and Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| LANCE D. BAILEY, et al., | ) ) | |
| Third-Party Defendants. | ) ) ) | |
| ERAN INDUSTRIES, INC.,<br>a Nebraska Corporation, | ) ) ) | CASE NO. 8:06CV51 |
| Plaintiff, | ) ) | |
| vs. | ) ) | MEMORANDUM AND ORDER<br>RE: CLAIM CONSTRUCTION |
| GP INDUSTRIES, LLC,<br>a Nebraska Limited Liability Company,<br>et al., | ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on Plaintiff GP Industries, Inc.'s Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 5,557,891 (Filing No. 240), Defendant ERAN Industries, Inc.'s Rule 56(f) Motion in Response to GP Industries' Motion

for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 5,557,891 (Filing No. 256), GP Industries' and Third Party Defendants' Opposition to Eran's Rule 56(f) Motion and Motion for Bifurcation of Issues (Filing No. 261), and the parties' request for Claim Construction (Filing Nos. 277 and 279).

GP Industries, Inc.'s ("GPI") filed suit against ERAN Industries, Inc.'s ("ERAN") requesting, *inter alia*, a Declaratory Judgment on Noninfringment and Invalidity of United States Patent No. 5,557,891 ("the '891 Patent"). Both GPI and ERAN are in the business of designing and selling gutter protection systems. ERAN claims GPI's products infringe upon the "water flow slowing means" protected by ERAN's '891 Patent. GPI asserts that its products do not contain the water flow slowing means described in the patent claims and, in the alternative, that the patent is invalid. On March 17, 2008, the Court conducted a Claim Construction (*Markman*) hearing to assist the Court in interpreting the meaning of the claim terms in dispute. Having carefully considered the '891 Patent, the prosecution history, the parties' briefs, and the arguments of counsel, the Court now makes the following findings and construes the disputed claim terms.

## CLAIM CONSTRUCTION STANDARD OF REVIEW

Claim construction is an issue of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly. *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir.1995). Claim construction is a way of elaborating normally terse claim language in order understand and explain, but not change, the scope of the claims. *Terlep v.*

*Brinkmann Corp.,* 418 F.3d 1379, 1382 (Fed. Cir. 2005). Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997).

"[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312. When construing claims, the words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1293 (Fed. Cir. 2005). To ascertain the meaning of a claim term, "the court looks to those sources available to the public that show what a person of ordinary skill in the art would have understood disputed claim language to mean." *Id.* A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

"The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The specification is always highly relevant, has been described as "the single best guide to the

meaning of a disputed term," and is typically dispositive. *See id.* "The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). However, the court must be cautious not to import limitations from the specification in determining the meaning of terms used in the claims. *Comark Comms. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed. Cir.1998).

Interpreting the asserted claims entails a review of the intrinsic evidence, which consists of the claim language, the written description, and the prosecution history. *Terlep v. Brinkmann Corp.,* 418 F.3d 1379, 1382 (Fed. Cir. 2005). The primary focus of the Court should be on intrinsic evidence. *Phillips*, 415 F.3d at 1312-14. A district court may rely on extrinsic evidence, however it cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence. *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1139 (Fed. Cir. 2004); *see Intel Corp. v. VIA Techs., Inc.,* 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of intrinsic evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained"). Extrinsic evidence is very broad, and basically includes all evidence but intrinsic evidence. Common forms of extrinsic evidence include dictionaries, reference books on the topic of the art, and expert testimony. Dictionaries may be helpful but are "less significant than the intrinsic record in determining the legally operative meaning of claim language." *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007). With this legal framework in mind, the Court turns to the claim construction.

## CONSTRUCTION OF DISPUTED TERMS

ERAN asserts that GPI products only infringe claims 1 and 2 of the '891 Patent. (Filing No. 279, ERAN Industries' Claim Construction Brief, p. 12).  Claim 1 the '891 Patent reads:

> A gutter protection system which serves to direct rain water into an underlying gutter system to which it is affixed while preventing the entry of debris into said underlying gutter system, said underlying gutter system being affixed to a lower edge of a sloped building roof and being oriented so as to assume a generally vertically downward slope between said downward sloped building roof and a point of attachment of said gutter protection to said underlying gutter system, said gutter protection system comprising: a primary body element in which is present a **water flow slowing means** which serves to essentially reverse the direction of flow of rain water at least twice between the entry of said rain water onto an upper surface of said gutter protection system, and the flow of said rain water into said underlying gutter system, which gutter protection system utilizes capillary action to direct said rain water flow through said water flow slowing means during use, said capillary action being unevaded through at least said first of said at least two flow direction reversals, said gutter protection system providing, via unevaded capillary action, said rain water exiting said first of said at least two flow direction reversals in said water flow slowing means at a vertically lower position than that at which said rain water entered said water flow slowing means.

(Claim 1, '891 Patent, col. 13) (emphasis added).  The second claim is for "A gutter protection system as in claim 1 in which the water flow slowing means comprises an "S" shape." (Claim 2, '891 Patent, col. 13).  The parties dispute the following claim terms.

### I.      "said gutter protection comprising"

The parties have provided contrary interpretations for the preamble of the claim. GPI proposes that this section be construed as "The claim preamble includes the context of the purported invention and its association to the existing building and rain gutter.  The overall gutter protection system slopes generally downward away from the building toward

5

the point of attachment on the existing rain gutter." (Filing No. 242-12, GPI Claim Chart). ERAN's proposed construction is to add a definition of "'comprising' to indicate that the gutter protection system includes at least the following elements and may include additional elements." (Filing No. 279-13, ERAN Proposed Construction).

In construing claims, it is for the Court to determine the terms that require construction and those do not. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). It is not necessary for this Court to construe the preamble, however, it is necessary to construe the term "comprising". "'Comprising' is a term of art used in claim language which means that the named elements are essential, but that other elements may be added and still form a construct within the scope of the claim". *Genetech, Inc. v. Chiron Corp.,* 112 F.3d 495, 501 (Fed. Cir. 1997) (*see also, CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.")

I, therefore, construe "said gutter protection comprising" to mean: *The gutter protection includes at least the following.*

**II.    "a water flow slowing means which serves to essentially reverse the direction of flow of rain water at least twice"**

Where a claim includes the word "means," a presumption is invoked that it is a means-plus-function clause under 35 U.S.C. § 112(6). *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005). The parties agree that the claim language "a water flow slowing means" is a means-plus-function format that requires the Court to determine the specified function associated with the means element and then identify the corresponding structure in the specifications of the '891 patent that performs the function.

6

(ERAN Brief, p. 14 and GPI Brief, p. 8).  Further, ERAN admits that water flow slowing is defined as a decrease in the flow rate or velocity of the water.  (Filing No. 279, p. 16).

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim will be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.  The means-plus-function construction requires a two-step process. First, the court must determine the claimed function. *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  Second, the court must identify the corresponding structure in the written description of the patent that performs that function. *Id.*  "Under this second step, the structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'"  *See, Medical Instrumentation and Diagnostics v. Elekta AB,* 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citations omitted).

"Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure." *TriMed, Inc. v. Stryker Corp.,* 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).  "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1304 (Fed. Cir. 1999) (A proper recitation of specific structure need not include "every last detail of structure disclosed in

7

the specification for performing the claimed [ ] function."). Further, sufficient structure may be disclosed when a "term, as the name for structure, has a reasonably well understood meaning in the art." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000) (citing *Greenberg v. Ethicon Endo-Surgery, Inc*., 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

### 1. Function

ERAN claims a two-part function "(I) slow the flow rate of water flowing on the upper surface of the gutter protection system, and (ii) essentially reverse the direction of flow of the water at least twice before the water enters the underlying gutter system." (ERAN brief, p. 15). Two interrelated functional phrases are specifically associated with the means element in claim 1 and both must be included in the construction of the claimed function. *See, e.g., Gemstar-TV Guide Int'l , Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004) (function of "means" for "displaying the television schedule on said television display as a grid" included both the function of displaying the schedule on the television screen and the function of displaying the schedule in grid format); *IMS Technology, Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1430-31 (Fed. Cir. 2000) (rejecting construction argument that focused on "transferring" function of "interface means" limitation but ignored additional "recording" function). I find that the '891 Patent contains interrelated functions, slowing the velocity of rain water flow and reversing the direction of the rain water at least twice.

### 2. Structures

The Court must next address which structures accomplish the means described in the claim. The '891 Patent discloses three embodiments of the water flow slowing means,



The '891 Patent describes the structure shown in FIG. 3b as a water flow slowing means that reverses the water flow direction at least twice. GPI argues that FIG. 3b, does not slow the flow of water, and in the alternative, that it does not reverse the water flow direction at least twice. Looking to the intrinsic evidence in this matter, the '891 Patent specification defines the structure that slows the water as:

> Continuing, it is to be especially understood that the angled configuration associated with the forth [sic], fifth and sixth lengths of construction material, which forth [sic], fifth and sixth lengths of construction material effect continuity between the third and seventh lengths of construction material, serves [sic] to provide, at the gradual one-hundred-eighty degree bend between the fifth and sixth lengths of construction material described about, a means at which the flow of water down the third length of construction material during use off of a slope roof, under the influence of capillary action, is slowed down. The combination of the forth [sic], fifth and sixth lengths of construction material constitute a "water flow slowing means". Alternative embodiments of the "water flow slowing means" are possible, but all have the common functional purpose of causing water flowing thereinto off of the third length of construction material to reverse direction of flow twice before flowing onto the surface of the seventh length of construction material. That is, assuming water flow does not evade control by capillary action, it will typically have to reverse flow direction as it follows the path from the third to the forth [sic] and fifth lengths of construction material, and again reverse flow direction as it follows the path from the fifth to the sixth lengths of construction material.

('891 Patent, col. 7, lines 33-55). The specification requires that there be three lengths of construction material (the fourth, fifth and sixth length) that must reverse the water flow

twice. GPI argues that FIG. 3b acts as a water accelerator rather than a water flow slowing means because the fourth, fifth and sixth lengths of construction material slope downward rather than in a horizontal direction.[1]  ERAN counters that the '891 Patent expressly teaches that the water flow is slowed by the final flow reversing bend in the water flow slowing means by the turbulence caused by exit onto the seventh length of construction material.

> It is possible that the water flowing as over the water flow slowing means as described above will follow the gradual approximately one-hundred-eighty angle between the fifth and sixth lengths of construction material and flow on to the seventh length of construction material under the control of capillary action, or it might, after reversing direction once, drip onto the seventh length of construction material. In any event, the flow of the water will be slowed by the turbulence creating effect caused by the presence of said "water flow slowing means.

('891 Patent, col. 7, lines 55-65).  ERAN contends that in FIG. 3b it is the second bend, and the turbulence effect created when faster flowing water comes in contact with slower flowing water on the seventh length of surface, that slow the rate of water. The affidavit of Alfred David Parr, PhD, supports the premise that the operation of the embodiments disclosed in the patent are possible. (Filing No. 279-12, Second Declaration of Alfred David Parr). Expert testimony that it is technologically possible to achieve the invention's function serves the permissible purposes of aiding the court's understanding of the technology and helping the court view the patent through the eyes of the skilled artisan.

---

[1]GPI argues that FIG. 3b is not clear because the drawing does not differentiate between the fourth, fifth and sixth lengths of construction material. However, the specification provides that "in the embodiment of FIG. 3b the forth [sic] and sixth lengths of construction material can be considered to be arcuate shaped, with the fifth length of construction material essentially straight therefore between." ('891 Patent, col. 10, lines 9-13). It is clear that all three lengths are present in FIG 3b.

*Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1371 (Fed. Cir. 2003);  See also, *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1309 (Fed. Cir. 1999) (it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.)  In this case, I find that the expert testimony of Dr. Parr is consistent with the teaching of the '891 Patent, and, therefore, I rely on the teaching of the '891 Patent, that the rain water flow will be slowed by the turbulence caused by the fourth, fifth and sixth lengths of construction material, when the water meets with slower flowing water on the seventh length of construction material in FIG. 3b.[2]

I find that "a water flow slowing means which serves to essentially reverse the direction of flow of rain water at least twice" means: *The water flow slowing means has a two-part function, (1) to slow the flow rate, or velocity, of rain water flowing from the upper surface of the gutter protection system, and (2) the water flow essentially reverses itself at least twice (flowing away from the building, then back towards the building and then back away from the building) before the water enters the underlying gutter system.*  Further, I find that the structures that comprise the water flow slowing means are generally designated by the numerals 20 and 20p.  The structures are depicted more specifically in FIGS. 1, 2, 3a, 3b, 10, 11, 12; col. 7, lines 34 through col.8, line. 1; col. 9, lines 12-13 and 26-27; col.9, line 55 through col. 10, line 31; col. 11, lines 20-31; col. 11 line 65 through col. 12, line 7; col. 12, lines 57-62; and col. 12, line 66 though col. 13, line 4.

---

[2]  FIG. 3b also reverses the flow of rain water twice.

**III.     "utilizes capillary action to direct said rain water flow through said water flow slowing means during use"**

The '891 Patent explains that the effect of capillary action is that "water flowing over the surface of a system element will follow the [sic] along the surface of an element, including bends in the surface" and that "capillary action causes water flowing under the influence of gravity to follow the surface of a system element over which it flows". (The '891 Patent, col. 4, lines 40-42.) ERAN requests the definition "the movement of a liquid along the surface of a solid caused by the attraction of molecules of the liquid to the molecules of the solid." (Filing No. 279, Ex. 8. The American Heritage Dictionary of the English Usage, 4th ed. Houghton Mifflin Co., 2004.) I find that there is no need to adopt extrinsic evidence, and that the description of capillary effect in the specification should be adopted as the proper explanation.

Therefore, I find that the term "utilizes capillary action to direct said rain water flow through said water flow slowing means during use" is defined as: *The gutter protection system uses capillary action (the process by which water flowing over the surface of a system element will follow along the surface of an element, including bends in the surface), to cause the rain water to flow through the water flow slowing means.*

**IV.     "said capillary action being unevaded through at least said first of said at least two flow direction reversals"**

GPI asserts that rain water must flow through the water flow slowing means at a "sufficient horizontal orientation of the first flow reversal and water slowing surface so that water flowing across the surface slows down and will not leave or drip from that surface." (242-14, GPI Claim Construction). To support this claim, GPI relies on a March 1996 letter

12

from patent counsel to the U.S. Patent and Trademark Office,[3] which provides in relevant part:

> "To be very clear, reference to Fig. 1 of the present Application will provide insight to the fact that water flowing to the left over construction material length (3), will undergo a first "flow direction reversal" upon capillary action effected flow over construction material length (4) onto construction material length (5). Water flowing by capillary action over construction material length (5) will be flowing essentially to the right in Fig. 1. Continuing, water flowing over construction material length (6) under the effect of capillary action will again be flowing essentially to the left in Fig. 1. . . .No such unevaded capillary action affected water flow path direction reversal can be identified in the Demartini '775 Patent Systems, emphasis added [sic].

(Filing No. 278-3, March 15, 1996 letter to Patent & Trademark Office, p. 2.)

However, the statement, when read in context, explains the difference in the structures in the '891 Patent and U.S. Patent No. 4,404,775 issued to Robert J. Demartini ("the '775 Demartini Patent"). The '891 Patent does not disavow all water flow slowing means that evade capillary flow after the first water flow reversal, and the '891 Patent teaches that FIG. 3b may evade capillary flow and slow rain water flow by turbulence (rain water "might, after reversing direction once, drip onto the seventh length of construction material.") ('891 Patent, col. 7, lines 62-64). Moreover, the '891 Patent further provides that even if capillary action is lost after the first water flow reversal, "the flow of the water will be slowed by the turbulence creating effect caused by the presence of said 'water flow slowing means.'" ('891 Patent, col. 7, lines 64-66).

---

[3] In a February 7, 1996, Office Action, claims 1-4 of the '891 patent application were rejected by the patent examiner as anticipated under 35 U.S.C. § 102(b) based on U.S. Patent No. 4,404,775 issued to Robert J. Demartini. The March 1996 letter submitted by counsel for the patent applicant responded to rejection and made a number of changes to the application, including adding to the claim language "said capillary action being unevaded through at least said first of said at least two flow direction reversals".

Therefore, I find that "said capillary action being unevaded through at least said first of said at least two flow direction reversals" means: *The capillary action continues to act on the rain water through at least the first of the at least two flow reversals*.

V. **"via unevaded capillary action, said rain water exiting said first of said at least two flow direction reversals in said water flow slowing means at a vertically lower position than that at which said rain water entered said water flow slowing means."**

GPI argues that this part of the claim requires the rain water to exit the water flow slowing means without pooling. In support, GPI relies on the March 15, 1996, letter in response to the Office Action provides in relevant part that:

> The Demartini Ridges (30) are essentially just "bumps" over which water flows. Some water might momentarily stop, and some might "bounce" backward upon encountering a Demartini Ridge (30), (have its velocity interrupted), but to do so capillary action must be interrupted. At any rate, any water flow direction reversal will immediately cause flowing water to assume a vertically higher level, emphasis added [sic]. The present invention system, however, effects a water flow direction reversal only if capillary action remain[s] intact, (ie unevaded), and positions water flowing there through immediately at a lower vertical position, emphasis added [sic].

(Filing No. 278-3, p. 3.) ERAN argues that the claim language was added to differentiate the claim from the '775 Demartini patent. Unlike the Demartini Ridges which push water up, the '891 Patent directs the rain water to a vertically lower length of construction material. The '891 Patent does not provide any length of time that the rain water will remain in the water flow slowing device, only that when the rain water does exit, it has to be vertically lower than when it entered the water flow slowing means.

Therefore, I find that the language of the claim is sufficient to determine "via unevaded capillary action, said rain water exiting said first of said at least two flow direction reversals in said water flow slowing means at a vertically lower position than that at which

14

said rain water entered said water flow slowing means" means: *Rain water which remains in contact with the surface of the water flow slowing means exits the first flow reversal at a vertically lower position than the level at which the rain water entered the water flow slowing means.*

## VI. "A gutter protection system as in claim 1 in which the water flow slowing means comprises an "S" shape."

Claim 2 of the patent is for "A gutter protection system as in claim 1 in which the water flow slowing means comprises an "S" shape." The '891 Patent specification uses this language to describe the FIG. 3b embodiment: "FIG. 3b shows a water flow slowing means (20p) which can be described as an 'S' shape." ('891 Patent, col. 10, lines 5-7).

A claim construction that excludes a preferred embodiment is rarely, if ever, correct. *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005), see also, *Vitronics*, 90 F.3d at 1583. Consequently, I find that claim 2 should be construed to mean: *The "S" shape includes structures such as designated by the numeral 20p in FIG. 3b.*

## PENDING MOTIONS

Pursuant to Fed. R. Civ. P. 56(f), "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." In this matter, the court finds that in light of the Magistrate Judge's ruling of April 10, 2008 (Filing No. 296) and April 22, 2008 (Filing

15

No. 298)[4], the pending Scheduling Order (Filing No. 275), and the claim construction contained herein, the Motion for Summary Judgment is denied subject to reassertion. The Rule 56(f) motion is granted, and the motion for bifurcation is denied.  If GPI would like the issues of Non-infringement and Invalidity determined separately, it may file separate Motions for Summary Judgment.

## CONCLUSION

In summary, the Court adopts the existing wording of the claims, except the following construction shall apply:

In claim 1, "said gutter protection comprising" is construed to mean: *The gutter protection includes at least the following.*

In claim 1, the means-plus-function is construed as:  *The water flow slowing means has a two-part function, (1) to slow the flow rate, or velocity, of rain water flowing from the upper surface of the gutter protection system, and (2) the water flow essentially reverses itself at least twice (flowing away from the building, then towards the building and then away from the building) before the water enters the underlying gutter system.*  The structures that comprise the water flow slowing means are generally designated by the numerals 20 and 20p.  The structures are depicted more specifically in FIGS. 1, 2, 3a, 3b, 10, 11, 12; col. 7, lines 34 through col.8, line. 1; col. 9, lines 12-13 and 26-27; col.9, line

---

[4] The Magistrate Judge's Orders resolved discovery disputes between the parties. The Scheduling Order requires, in relevant part, that all fact discovery shall be commenced and served in time to be completed no later than four (4) months following the date if this Order, and that all dispositive motions shall be filed no later than seven (7) months following the date of this Order.

55 through col. 10, line 31; col. 11, lines 20-31; col. 11 line 65 through col. 12, line 7; col. 12, lines 57-62; and col. 12, line 66 though col. 13, line 4.

In claim 1, the claim terms "utilizes capillary action to direct said rain water flow through said water flow slowing means during use" is construed as: *The gutter protection system uses capillary action (the process by which water flowing over the surface of a system element will follow along the surface of an element, including bends in the surface), to cause the rain water to flow into and through the water flow slowing means.*

In claim 1, the claim terms "said capillary action being unevaded through at least said first of said at least two flow direction reversals" are construed to mean: *The capillary action continues to act on the rain water through at least the first of at least two flow reversals.*

In claim 1, the claim terms "via unevaded capillary action, said rain water exiting said first of said at least two flow direction reversals in said water flow slowing means at a vertically lower position than that at which said rain water entered said water flow slowing means" are construed to mean: *Rain water which remains in contact with the surface of the water flow slowing means exits the first flow reversal at a vertically lower position than the level at which the rain water entered the water flow slowing means.*

In claim 2, the claim for "A gutter protection system as in claim 1 in which the water flow slowing means comprises an 'S' shape" is construed as including "S" shape structures such as designated by the numeral 20p in FIG. 3b.

IT IS ORDERED:

1. Plaintiff GP Industries, Inc.'s Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 5,557,891 (Filing No. 240) is denied without prejudice to reassertion;

2. Defendant ERAN Industries, Inc.'s Rule 56(f) Motion in Response to GP Industries' Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent No. 5,557,891 (Filing No. 256) is granted;

3. GP Industries' and Third Party Defendants' Opposition to Eran's Rule 56(f) Motion and Motion for Bifurcation of Issues (Filing No. 261) is denied; and

4. The Court construes the Claims 1 and 2 of U.S. Patent No. 5,557,891 as provided herein.

DATED this 9th day of May, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge